UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————x

GAETANO BRACCO,

                Plaintiff,

                        **MEMORANDUM & ORDER**
       v.                       13–CV–2637 (PKC)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

———————————————————x
PAMELA K. CHEN, United States District Judge:

      Plaintiff Gaetano Bracco ("Bracco" or "Plaintiff") commenced this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Defendant Commissioner of Social Security (the "Commissioner") denying Bracco's claim for Social Security Disability benefits. (Dkt. 1.) The Commissioner moves for judgment on the pleadings, affirming his decision, and Bracco cross–moves for judgment on the pleadings, reversing the Commissioner's decision and remanding for a new hearing and decision. Fed. R. Civ. P. 12(c); (Dkt. Nos. 15, 17). For the reasons set forth below, the Court GRANTS Bracco's cross–motion, and DENIES the Commissioner's motion.

*BACKGROUND*

**I.**     **Medical Evidence**

**A. Prior to Plaintiff's Alleged Onset Date of June 21, 2010**

      Plaintiff was initially seen by Anna Kharitonova, M.D., on December 16, 2009 with complaints of depression, poor sleep, low energy, and panic attacks. (Tr. 172–73, 177.)[1]

---

[1] "Tr. __" refers to the administrative record, which largely consists of the record considered by Administrative Law Judge Patrick Kilgannon ("ALJ"). (Dkt. 6.)

Plaintiff stated that he first felt depressed one and one–half years earlier when he quit drinking. (Tr. 177.)  Plaintiff stated that he gained about eighty pounds during this one and a half year period.  He was attending Alcoholics Anonymous ("AA") meetings at the time.  (*Id.*)

Upon mental status examination, Plaintiff appeared anxious and depressed.  (Tr. 172.) His behavior was tense.  Plaintiff's speech was slow, and his mood was depressed and anxious. Plaintiff's affect was constricted.  There was no evidence of depersonalization, and Plaintiff denied having hallucinations.  Plaintiff's thought process was goal–directed.  He reported delusions insofar as he believed that people were after him.  Plaintiff had impaired concentration, limited judgment and insight, and average intelligence.  (*Id.*)  Dr. Kharitonova diagnosed an Axis 1, adjustment disorder with mixed anxiety, alcohol dependency, depressed mood, and panic disorder without agoraphobia.[2]  (Tr. 173.)  She rated Plaintiff's GAF as 59.[3]  Dr. Kharitonova prescribed Lexapro and recommended psychotherapy.  (*Id.*)

Plaintiff presented to Dr. Kharitonova for follow up on December 30, 2009.  (Tr. 176.) Plaintiff stated that he felt stressed out and had an anxiety attack.  He complained that his concentration and focus were poor.  Plaintiff reported having no side effects from the medication.  Upon mental status examination, Plaintiff appeared anxious.  His speech was slow. Plaintiff's mood was sad and anxious.  Plaintiff's affect was constricted and his thought process

---

[2] In the multi–axial evaluation, Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V rates the patient's Global Assessment of Functioning ("GAF").  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th edition – text revision 2000) ("DSM–IV–TR") at 27–34.

[3] GAF scores are assessments of individuals' "overall level of functioning," *i.e.*, psychological, social, and occupational functioning.  Scores in the range of 51 and 60 indicate moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co–workers).  DSM–IV–TR at 34.

was coherent. Plaintiff exhibited no delusions. He denied suicidal/homicidal ideation. Plaintiff had reduced attention and concentration. His insight and judgment were fair. Dr. Kharitonova prescribed Lexapro. (*Id.*)

Upon follow–up on January 13, 2010, Plaintiff reported to Dr. Kharitonova that he had been sad, depressed, and stressed. (Tr. 175.) Mental status findings were unchanged, and Plaintiff was to continue taking Lexapro. He had no medication side effects. (*Id.*) On February 3, Plaintiff reported feeling stressed out and anxious, and complained of poor sleep. (Tr. 174.) He stated that he still had panic attacks. There were no medication side effects. Mental status examination was unchanged except that Plaintiff's appearance was sad. Plaintiff was to continue taking Lexapro. (*Id.*) On February 22, Plaintiff reported feeling less anxious with fewer panic attacks. (Tr. 185.) Mental status revealed Plaintiff's mood to be anxious. His affect was labile. Plaintiff spoke at a normal rate. The remainder of the examination was unchanged. Plaintiff reported having no side effects from Lexapro and was to continue using it. (*Id.*)

On March 24, 2010, Plaintiff related to Dr. Kharitonova that he still felt anxious but less stressed. (Tr. 184.) He reported having no medication side effects. Mental status examination revealed Plaintiff to appear sad with a constricted affect. His mood was sad and anxious. Examination was otherwise unchanged. Plaintiff was to continue taking Lexapro. (*Id.*) Upon returning to Dr. Kharitonova on April 21, 2010, Plaintiff complained of being depressed, anxious, and not sleeping well. (Tr. 183.) Plaintiff had no medication side effects. On mental status examination, Plaintiff's appearance was normal. His mood was sad and anxious. Plaintiff's thought process was coherent. The remainder of the examination was unchanged. Dr. Kharitonova prescribed Lexapro. (*Id.*)

On May 19, Plaintiff reported being sad, depressed, and stressed out. (Tr. 182.) He had no medication side effects. His appearance was normal and mood was anxious. The remainder of the examination was unchanged. Plaintiff was to continue taking Lexapro. (*Id.*) On June 9, Plaintiff stated that he was stressed. (Tr. 181.) Plaintiff had no medication side effects. His appearance was sad. Plaintiff's mood was sad, but not anxious. Thought process was circumstantial. Examination was otherwise unchanged. Plaintiff was to begin taking Buspar in addition to Lexapro. (*Id.*)

**B. Evidence on or After June 21, 2010 (Alleged Onset Date)**

On June 23, Plaintiff complained of being very depressed to Dr. Kharitonova. (Tr. 180.) He reported having fallen at work about three days earlier and complained of pain all over his body. He appeared sad and his mood was sad and anxious. Dr. Kharitonova prescribed Lexapro and Buspar. (*Id.*)

Electrodiagnostic studies conducted on June 23, 2010, showed hyperconduction of class III fibers of the right peroneal and sural nerves, probably due to irritation. (Tr. 168.)

Plaintiff was seen by Joseph Fricano, a board certified chiropractic neurologist, on June 29, 2010, for examination and treatment of injuries reportedly sustained while working as a plumber for the New York Police Department. (Tr. 164–65.) Plaintiff stated that on June 21, 2010, he slipped and twisted his left knee and thoracic and lumbar spine, and fell on his knee. (Tr. 164.) He complained of middle and low back pain, left knee pain with crepitus, and numbness and weakness in both legs. Examination revealed decreased lumbosacral range of motion with spasm and complaints of pain on palpation over the bilateral sacroiliac joints and medial knee. McMurray's test was positive, as were compression signs. There was edema of the medial knee. Achilles jerk was decreased on the right. There was decreased pin prick sensation

over the right L5–S1.  Straight leg raising was positive at 50 degrees on the right.  Pelvic tilt and Kemp's and Valsalva maneuvers were positive.  (*Id.*)  Dr. Fricano diagnosed cervical, thoracic, and lumbar disc syndrome and internal derangement of the left knee.  (Tr. 164–65.)  He recommended physical therapy for the left knee and chiropractic treatment for the thoracic and lumbar spines.  (Tr. 165.)  Plaintiff was to undergo electromyography ("EMG") of the lower extremities, MRI of the lumbosacral spine and left knee, and an orthopedic consultation.  (*Id.*)

When next seen by seen Dr. Kharitonova on June 30, 2010, Plaintiff complained that he was depressed and had back and leg pain.  (Tr. 179.)  Examination was unchanged except that his thought process was circumstantial and cognition was slowed.  (*Id.*)  Plaintiff had no medication side effects, and Dr. Kharitonova prescribed Lexapro and Buspar (at an increased dosage).  (*Id.*)  On July 14, Plaintiff complained that he was depressed, had back pain, and was sleeping poorly.  (Tr. 178.)  Examination and treatment were unchanged.  Plaintiff was to continue taking Lexapro and Buspar.  (*Id.*)

Plaintiff was evaluated by Armin M. Tehrany, M.D., an orthopedic surgeon, on July 27, 2010.  (Tr. 159–62, 170.)  Plaintiff stated that he had "multiple bouts" of swelling in his left knee and a feeling that there was a loose fragment in his knee.  (Tr. 159.)  Plaintiff also said that he had episodes of knee−locking.  On examination, there was tenderness of the medial and lateral joint lines with some edema and effusion.  Plaintiff exhibited full range of motion.  A Lachman test was equivocal due to Plaintiff's reports of pain.  (*Id.*)  Dr. Tehrany diagnosed internal derangement of the left knee with a possible loose fragment and ordered an MRI of the left knee. (*Id.*; *see* Tr. 160, 162.)

Plaintiff was examined by Shan Nagendra, M.D., on August 16, 2010, for a follow−up neurological examination and pain management.  (Tr. 236.)  Plaintiff complained of left knee

pain with numbness and weakness in both legs. Plaintiff was observed using a cane to walk. Examination of the thoracic spine revealed abnormal range of motion on flexion, extension, and right rotation, all with pain. *Id.* Percussion sign was positive at T5–T7. Examination of the lumbar spine revealed tenderness and spasm bilaterally. Flexion, extension, rotation bilaterally, and lateral flexion bilaterally were all abnormal and accompanied by pain. Range of left knee motion was abnormal on flexion and extension. Dr. Nagendra prescribed Percocet and continued physical therapy. (*Id.*)

Upon follow–up with Dr. Nagendra on September 7, 2010, Plaintiff complained of left knee pain. (Tr. 234.) Examination of the lumbar spine revealed pain on flexion, extension, rotation bilaterally, and flexion bilaterally. Examination of the left knee revealed pain on flexion and extension. Dr. Nagendra gave Plaintiff a referral for an MRI of the left knee and prescribed Percocet. (*Id.*)

Plaintiff was seen by Vilor Shpitalnik, M.D., on September 7, 2010 for a psychiatric evaluation. (Tr. 239–40.) Plaintiff presented with complaints of depression, anxiety, insomnia, lack of energy, feelings of hopelessness, helplessness, nightmares, panic attacks, and persistent, and at times, excruciating physical pain. (Tr. 239.) Plaintiff stated that his emotional condition became worse after the events of September 11, 2001, when he worked for two weeks cleaning up the World Trade Center area. (Tr. 239; *see* Tr. 237.) Plaintiff alleged that he started drinking alcohol in order to alleviate emotional instability, and he continued working. (Tr. 239.) Plaintiff related that in 2008, he was admitted to an inpatient drug treatment program for 28 days, and had not consumed alcohol since that time. He received psychiatric treatment with Dr. Kharitonova, who prescribed Lexapro and Buspar. Plaintiff indicated that during the course of treatment, his condition substantially improved and he was able to work fulltime. Plaintiff stated that a work–

related injury on June 21, 2010, caused psychological instability and his current complaints. (*Id.*)

Upon mental status examination, Plaintiff presented with a sad facial expression. (Tr. 240.) He appeared in physical discomfort as the interview progressed. Plaintiff's affect was constricted. His mood was depressed, anxious, and tense. Plaintiff's speech was coherent, articulate, and goal–directed. There was no evidence of a thought process disorder and no circumstantiality or tangentiality. There was no evidence of psychosis and Plaintiff denied hallucinations and delusions. Plaintiff had no ideas of reference and denied suicidal or homicidal ideation. Plaintiff's sensorium was clear. His long–term memory was grossly intact. Plaintiff's short–term memory was limited; he remembered three objects in a five−minute interval and was able to recall one out of three. Plaintiff's attention and concentration were limited as tested by serial subtraction and observed in general conversation. His insight and judgment were good. Dr. Shpitalnik diagnosed on Axis I, major depressive disorder. He rated Plaintiff's GAF as 60. Dr. Shpitalnik recommended psychotherapy and prescribed Lexapro and Buspar, indicating that he intended to increase Plaintiff's dosage. (*Id.*)

Upon return to Dr. Nagendra on September 21, 2010, Plaintiff complained of low back and left knee pain. (Tr. 233.) He was walking with a cane and taking Percocet. Plaintiff was to continue with physical therapy and taking medication. (*Id.*)

X–rays of the lumbosacral spine taken on September 30, 2010 by Kikkeri Vinaya, M.D. revealed no significant degenerative disease. (Tr. 193.) X–rays of the left knee showed three well corticated bony densities suggesting loose bodies, for which further evaluation as clinically dictated was suggested. There were no significant degenerative changes of the knee joint. (*Id.*)

Mahedra Misra, M.D., conducted a consultative physical examination on September 30, 2010. (Tr. 186–92.) Plaintiff was driven to the examination by his father. (Tr. 187.) He presented with complaints of back and left knee pain for the past three months. (Tr. 186.) Plaintiff indicated that his mid and lower spine were in constant pain, rated as ten out of a scale of ten, and that the pain radiated to his legs. (Tr. 187.) He further reported that his left knee swelled at times, and that walking and doing steps was painful. He stated that he could stand for only fifteen minutes at a time and sit for one–half hour. He further said that he could not walk more than two blocks at a time with the help of a cane, was not was not capable of lifting or carrying any weight, and that his wife did all the household chores. Plaintiff also stated that he did not drive. (*Id.*)

Upon examination, Plaintiff, who was 69 inches tall, weighed 292 pounds, and appeared obese. (Tr. 187–88.) Plaintiff preferred to walk with the help of a cane, which had been prescribed. (Tr. 188.) Plaintiff walked heel–to–toe with heavy limping and was not able to heel walk, toe walk, or squat. His posture was erect. Plaintiff was unable to get on the examination table, and the examination was conducted in the sitting and standing positions. Dr. Misra found Plaintiff's neurological status in both upper and lower extremities to be normal with no evidence of any motor or sensory deficit. Plaintiff had good finger dexterity and full grip strength bilaterally. (*Id.*) Cervical and shoulder movements were normal, with complaints of discomfort. (Tr. 188, 191, 192.) Movements of the thoracic/lumbar spine were very restricted; flexion–extension was 10 degrees (90 full) and lateral flexion was five degrees (30 full). (Tr. 188, 192.) Straight leg raising was five degrees on the right and zero degrees on the left. (*Id.*) The hip and knee joints were restricted; flexion extension of the knee was 40 degrees on the right and 5

degrees on the left (120 normal). (Tr. 188, 191.) There was evidence of muscle spasm in the lumbar paravertebral muscles. (Tr. 188.) There was no muscle atrophy. (*Id.*)

Dr. Misra's impression was that Plaintiff most likely had discogenic type disease in the cervical, thoracic, and lumbar spines, but he noted that his findings were entirely clinical because Plaintiff had not undergone a radiological or neurological workup. (Tr. 189.) He opined that Plaintiff would not be able to do jobs which required prolonged standing, sitting, walking, crouching, bending, climbing, lifting, pulling, or pushing. (*Id.*)

Dana Jackson, Psy.D., conducted a consultative psychiatric examination on October 3, 2010. (Tr. 194–97.) Plaintiff was driven to the examination by his father. (Tr. 194.) He presented with complaints of anxiety. (*Id.*) Plaintiff stated that he had feelings of sadness, hopelessness, worthlessness, periodic crying spells, anhedonia, decreased energy, increased appetite, increased sleep, and periodic thoughts of death without suicidality. (Tr. 194–95.) He reported having panic attacks, during which, he experienced heart palpitations, sweating, a feeling that he was going to die, and that he was going crazy. (Tr. 195.) Plaintiff stated that panic attacks changed his life such that he could not be around people for a long period of time. He was currently taking Lexapro and Buspar. Plaintiff also reported a history of alcohol usage every day between 2001 and 2008 and had a history of inpatient alcohol rehabilitation. He has since been sober and attended AA meetings. (*Id.*)

Upon mental status examination, Plaintiff was cooperative and answered questions willingly and openly. (Tr. 195.) Plaintiff was agitated during the evaluation reportedly due to left knee and back pain. (*Id.*) Dr. Jackson observed that Plaintiff walked with a cane and appeared to be in distress because of his reported pain. (Tr. 197). Plaintiff's speech was coherent and relevant, and tone and intensity were within normal limits. (Tr. 195.) There were

no speech deviations. *Id.* Plaintiff exhibited no thought process disorder. (Tr. 196.) His thoughts were logical, purposeful, and goal–directed. Plaintiff had no delusions or hallucinations. He denied any history of hearing voices. Plaintiff's affect was dysphoric, and his mood was "tired and not good." (*Id.*) Plaintiff denied suicidal or homicidal ideation, plan, or intent. Plaintiff exhibited good remote memory functions. His recent memory functions were diminished. He recalled one out of four objects after five minutes. His auditory digit span was intact with a recall of five digits forward and three backward. Plaintiff's attention and concentration were within normal limits. He was able to do simple calculations. Plaintiff exhibited below average intellectual skills. His general knowledge and fund of information were well below average. Plaintiff did not exhibit good abstract thinking capacity. He was unable to interpret proverbs and similarities and unable to do serial sevens. Plaintiff had good insight into his condition. His social judgment skills were within normal limits. (*Id.*)

Plaintiff reported that he did not cook, clean, or shop. (*Id.*) He did not drive or use public transportation. Plaintiff stated that he minimally socialized and did not list any current interests or hobbies. Dr. Jackson opined that Plaintiff's allegations and his mental status evaluation appeared to be consistent. (*Id.*)

Dr. Jackson diagnosed on Axis I: depressive disorder not otherwise specified; rule–out major depressive disorder recurrent type; anxiety disorder not otherwise specified; rule–out panic disorder without agoraphobia; and alcohol dependence in full remission. (Tr. 196–97.) She noted that Plaintiff should continue with Lexapro and Buspar to address his depressive and anxiety symptoms, and would benefit from psychotherapy. (Tr. 197.) Dr. Jackson opined that Plaintiff's symptoms appeared to be of a moderate nature and that his ability to interact with others in a social situation appeared to be intact. (*Id.*)

When seen by Dr. Nagendra on October 5, 2010, Plaintiff reported that his complaints of left knee and low back pain were unchanged. (Tr. 235.) He was walking with a cane and taking Percocet. Dr. Nagendra instructed Plaintiff to continue physical therapy and medication. (*Id.*) Mario Funicelli, D.C., completed a progress report for the New York State Workers' Compensation Board on October 11, 2010. (Tr. 166–67.) Dr. Funicelli, who had seen Plaintiff that day, diagnosed lumbosacral radicular syndrome and internal derangement of the knee and opined that Plaintiff had a 100% temporary impairment and could not return to work. (*Id.*)

W. Skranovski, a state agency psychiatric consultant,[4] reviewed the medical evidence of record and completed a "Psychiatric Review Technique" form on October 26, 2010. (Tr. 198–211.) Skranovski concluded that Plaintiff's impairments did not meet the criteria of sections 12.04 (Affective Disorders), 12.06 (Anxiety–Related Disorders), or 12.09 (Substance Addiction Disorders) of the Listing of Impairments, but noted that Plaintiff presented a medically determinable impairment in each of these categories. (Tr. 198, 201, 203, 206.) With respect to the "B" criteria of the Listing of Impairments, Skranovski opined that Plaintiff had no restriction of activities of daily living and no difficulties in maintaining social functioning or maintaining concentration, persistence, or pace. (Tr. 208.) Plaintiff had no repeated episodes of deterioration. (*Id.*)

On November 10, 2010, Plaintiff complained to Dr. Nagendra of left knee and low back pain. (Tr. 232.) He walked with a cane. Dr. Nagendra renewed Plaintiff's medication and noted that Plaintiff was awaiting clearance for an MRI. (*Id.*) On November 23, Plaintiff complained of low back pain and was walking with a cane. (Tr. 231.) He was still awaiting clearance for

---

[4] Plaintiff challenges Skranovski's qualifications and contends that Skranovski is a layperson rather than a physician. (Dkt. 18 at 10.) As the record does not conclusively establish that Skranovski is in fact a physician, and the ALJ's decision did not identify Skranovski's profession, the Court will not use the title "Dr."

MRI of his left knee. Examination of the left knee revealed pain on palpation and abnormal range of motion on flexion and extension with pain. There was no edema noted. Dr. Nagendra renewed Plaintiff's medication and instructed Plaintiff to continue physical therapy. (*Id.*) Examination of the left knee on December 8, revealed pain on palpation and abnormal range of motion on flexion and extension at 80 degrees with pain. (Tr. 230.) Patella grind and anterior drawer tests were positive. There was no edema noted. (*Id.*) On December 22, Plaintiff stated that medication provided no relief. (Tr. 229.) Examination of the left knee revealed abnormal range of motion on flexion and extension. Patella grind and anterior drawer tests were positive. Dr. Nagendra changed Plaintiff's medication. (*Id.*)

When seen by Dr. Nagendra on January 5, 2011, Plaintiff complained of increasing pain over the prior few weeks. (Tr. 227.) Examination of the left knee revealed pain on palpation. There was abnormal range of motion on flexion and extension and positive patella grind and anterior drawer tests, all with pain. Plaintiff was still awaiting an MRI of his knee. Dr. Nagendra renewed Plaintiff's medication. (*Id.*)

An MRI of Plaintiff's left knee conducted on January 14, 2011 showed tricompartmental cartilage abnormalities (worst in the lateral compartment) and a small joint effusion. (Tr. 245–46.)

Upon return to Dr. Nagendra on January 19, 2011, Plaintiff stated that medication was not helpful. (Tr. 228.) He was waiting for the MRI results of his left knee. Examination was unchanged from the prior visit. Dr. Nagendra stated that Plaintiff was to continue with the present course of therapy and referred Plaintiff to pain management. (*Id.*)

Dr. Shpitalnik conducted an updated psychiatric evaluation on February 1, 2011. (Tr. 237–28). The report indicated that Plaintiff's psychological condition had not changed since his

pain and disability represented the main stressors and still persisted. (Tr. 237.) Plaintiff reported that he was withdrawn, homebound, and had quit most of his usual activities. He further reported that his depression and anxiety affected his ability to concentrate, which interfered with his daily activities. Dr. Shpitalnik noted that Plaintiff was compliant with treatment, took his medication, and kept his appointments. Upon mental status examination, Plaintiff presented with a sad facial expression. He appeared to be in physical discomfort as the interview progressed. (*Id.*) Plaintiff's speech was coherent, articulate, and goal–directed. (Tr. 237–38.) There was no circumstantiality or tangentiality. (Tr. 238.) Plaintiff's affect was constricted and his mood was depressed, anxious, and tense. There was no evidence of psychosis elicited. Plaintiff had no ideas of reference and denied hallucinations or delusions. Plaintiff denied having suicidal or homicidal intentions. Dr. Shpitalnik noted that Plaintiff's cognitive functioning was significant for short–term memory and attention concentration deficit. Dr. Shpitalnik diagnosed major depressive disorder and opined that Plaintiff was in need of continued psychiatric treatment. (*Id.*)

On February 3, 2011 by Dr. Tehrany requested medical clearance for Plaintiff to undergo minimally invasive left knee arthroscopic synovectomy and arthroscopic removal of a loose body. (Tr. 251.)

An MRI of the lumbosacral spine conducted on June 13, 2011, revealed (1) no significant focal bony injury or other bony lesions; (2) moderate dextroscoliosis; and (3) a small focal central protrusion at the L5–S1 level not associated with any significant neural impingement. (Tr. 244.)

Plaintiff was examined by Igor Stiler, M.D., a neurologist, on September 9, 2011. (Tr. 255–56.) Plaintiff complained of an increase in left knee pain, which he rated 8−9 out of a scale

of 10.  (Tr. 255.)  He used a cane to assist with ambulation due to knee pain and was awaiting authorization for surgery on his left knee.  Plaintiff also had low back pain, rated as 8−9 out of a scale of 10.  Examination of the cervical spine revealed no tenderness or muscle spasm, and there was full range of motion in all planes.  Examination of the lumbar spine revealed tenderness and spasm at L3 through S1.  Range of motion was limited as follows: flexion to 40–50 degrees (90 normal); extension to 20 degrees (30 normal); and lateral flexion was 20 degrees bilaterally (30 normal).  Straight leg raising was performed to 60 degrees bilaterally (90 normal).  (*Id.*)  Muscle strength was 5/5 (full) in all tested muscle groups.  (Tr. 255–56.)  Plaintiff had no sensory deficit and deep tendon reflexes were 2+/4 bilaterally in all extremities.  (Tr. 256.)  There was tenderness in the infrapatellar region of the left knee increasing with external rotation and flexion.  Plaintiff walked with an antalgic gait.  Dr. Stiler opined that Plaintiff had a temporary total disability and needed authorization for surgery of the left knee, followed by rehabilitation of the knee.  He believed that when issues with the left knee resolved, Plaintiff's low back symptoms might improve.  Dr. Stiler noted, however, that if Plaintiff's left knee pathology were not addressed, his lumbar symptoms would continue and become worse.  (*Id.*)

Dr. Shpitalnik, the psychiatrist, examined Plaintiff again on November 22, 2011.  (Tr. 241.)  Plaintiff complained of depressed mood, anxiety, and insomnia, which remained unchanged over the prior five weeks.  Plaintiff indicated that his sleep was inadequate.  Upon mental status examination, Plaintiff appeared tense and apprehensive.  His grooming was poor.  Plaintiff's mood was sad and anxious.  His affect was constricted.  Plaintiff's thoughts were coherent and he had no delusions.  Plaintiff denied having hallucination and denied suicidal or homicidal ideation.  His long term memory was intact.  Plaintiff's short–term memory was impaired and his attention was reduced. *Id.* Plaintiff insight was fair and his judgment was good.

Dr. Shpitalnik prescribed Lexapro and an increased dosage of Xanax. Dr. Shpitalnik wrote that Plaintiff was unable to function in any work setting. (*Id.*)

Chitoor Govindaraj, M.D., conducted a consultative physical examination on January 19, 2012. (Tr. 257–60.) Plaintiff presented with neck, back, and knee pain. (Tr. 257.) Plaintiff's medications consisted of Percocet (four daily), Nasonex, Advair, Nexium, Lexapro, and Xanax (twice daily). (Tr. 257–58.) Plaintiff had a driver's license and drove. (Tr. 258.) He denied having undergone surgery. He performed home exercises. On examination, Plaintiff, who was 68 inches tall, weighed 280 pounds. (*Id.*) Examination of the spine revealed no kyphoscoliosis, gibbous, or tenderness. (Tr. 259.) Range of motion was within normal limits. Examination of the extremities revealed full vibratory sense and knee jerks. Motor system, sensory system, and reflex findings were all normal. Range of back motion and joints were normal. There was no evidence of muscle spasm. Straight leg raising was normal. Plaintiff's posture and gait were normal. He did not need a cane for ambulation. (*Id.*)

Dr. Govindaraj diagnosed: (1) history of back, neck, and knee pain; (2) history of gastrointestinal reflux disease; (3) history of allergic rhinitis; and (4) history of bronchospasm and occasional difficulty breathing with no definite history of asthma. He opined that Plaintiff was medically stable and cleared with no restrictions for standing, walking, or lifting weights. (*Id.*)

## II.     Non–Medical Evidence

Plaintiff was born in 1968 and has a high school education. (Tr. 33, 98, 117). Plaintiff was employed as a plumber between January 1990 and February 21, 2010. (Tr. 33, 118.) The job required walking for three hours per day, standing four hours, sitting one hour, and lifting 100 pounds or more. (Tr. 118–19, 132–33.)

In a function report dated September 30, 2010 (Tr. 122–31), Plaintiff indicated that he lived with his family in a house. (Tr. 122.) Plaintiff wrote he did not perform any household chores or prepare meals; all such activities were done by his wife or son. (Tr. 123–24.) He stated that he had a hard time with personal care and that such activities took longer. (Tr. 123.) Plaintiff indicated that his impairments impacted his ability to sleep. (*Id.*) Plaintiff stated that he could go out alone and sometimes drive if he was not in too much pain. (Tr. 125.) He otherwise received rides from others. Plaintiff indicated that he did not shop. (*Id.*) Plaintiff related that he did no longer paid bills, counted change, or handled a savings account, stating that he had a hard time counting. (Tr. 126.) Plaintiff did not socialize. (*Id.*)

Plaintiff stated that his ability to sit was "OK." (Tr. 127.) He wrote that he could not stand for too long or walk much. He climbed stairs very slowly and was unable to kneel or squat. His ability to reach was not good. Plaintiff wrote that his ability to use his hands was "ok" but not as good as before. (*Id.*) Plaintiff indicated that he walked with the aid of crutches or a cane and that the crutches were prescribed by a doctor. (Tr. 128.) He used an assistive device all the time. Plaintiff wrote that he was limited to walking ten feet at a time before needing to rest for ten minutes. Plaintiff stated that he had problems paying attention because he "wander[ed] off[,]" and that he was unable to finish what he starts because he got tired. (*Id.*) Plaintiff indicated that he could follow written instructions but not spoken instructions. He did not have difficulty getting along with people in authority. (*Id.*) Plaintiff related that he had trouble remembering things and that stress or schedule changes made him tired. (Tr. 129.) His wife reminded him to take his medication and to take care of his personal needs and grooming. (Tr. 124.)

Plaintiff also answered questions about pain.  (Tr. 129–31.)  Plaintiff wrote that he first experienced it on June 21, 2010, and it began to affect his activities at that time.  (Tr. 129.) Plaintiff had left knee and back pain, which he described as stabbing accompanied by numbness in both legs.  (Tr. 129–30.)  Plaintiff stated that pain occurred all the time and was getting worse. (Tr. 130.)  All activities caused pain.  Plaintiff used Percocet four times a day to relieve the pain. It worked fast but did not last too long.  Plaintiff stated that Percocet caused nausea.  (*Id.*)

Plaintiff testified at the hearing held on December 13, 2011.  (Tr. 33–40.)  Plaintiff stated that on June 21, 2010, he was working and slipped on a piece of pipe.  (Tr. 34.)  He testified that he twisted his back and knee and was knocked unconscious because he landed on his head.  (*Id.*) Plaintiff testified that he was attempting to file for retirement and disability pension; he also stated that he was currently receiving Workers' Compensation benefits.  (Tr. 35.)  Plaintiff stated that he was unable to look for work because he could not move.  Plaintiff testified that he was doing physical therapy twice a week and was waiting for clearance from Workers' Compensation to undergo knee surgery.  (*Id.*)

Regarding his mental conditions, Plaintiff stated that he saw a doctor for depression, anxiety, and flashbacks.  (Tr. 36.)  Plaintiff testified that the Lexapro and Xanax he was prescribed for these conditions were helping.  (*Id.*)

Plaintiff stated that his wife cooked for him and worked outside the home.  (Tr. 36–37.) Plaintiff testified that he was unable to sleep.  (Tr. 36.)  He stated that he could not lie down or stand too long.  (Tr. 37.)  Plaintiff testified that he could get dressed with some assistance from his wife.  Plaintiff could bathe himself on occasion.  (*Id.*)  He testified that he did not take care of his son at all.  (Tr. 36–38.)  Plaintiff stated that he spent his days trying to watch television.  (Tr.

38.) He stated that he had to get up every couple of hours because of the pain. Plaintiff testified that he could not read a book because he could not maintain concentration. (*Id.*)

Plaintiff testified that he could lift a maximum of three or four pounds. (Tr. 38.) He stated that he could stand for ten to fifteen minutes, after which he got sharp pains in his back and his knee buckled or gave out. (Tr. 38–39.) Plaintiff testified he could walk up to one–half block. (Tr. 39.) He stated that he started using a cane the day that he got hurt. He could sit for about one–half hour to 45 minutes at a time. (*Id.*) Plaintiff testified that he could not drive and that he primarily got around by having his father drive him. (Tr. 34.)

### III.   <u>Vocational Expert Testimony</u>

Edna Clark, a vocational expert, testified at the hearing. (Tr. 40–43; *see* Tr. 95–96.) Ms. Clark testified that according to the U.S. Department of Labor, Dictionary of Occupational Titles ("DOT"), Plaintiff's work as a plumber (DOT No. 862.381–030) is heavy and skilled. (Tr. 41.) The ALJ posed a hypothetical individual of Plaintiff's age, education, work experience with the residual functional capacity to perform sedentary work (*i.e.* lifting up to ten pounds occasionally, standing or walking approximately two hours per eight–hour workday, siting for approximately six hours per eight–hour workday with normal breaks) with no frequent pushing, pulling, operating hand or foot controls. The individual could not climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could occasionally balance, stoop, kneel, crouch, or crawl; and had no manipulative, visual, or communicative limitations. The individual was also limited to low–stress jobs, meaning only occasional decision making and occasional changes in the work setting. Ms. Clark responded that such an individual was unable to perform Plaintiff's past work. (*Id.*)

In response to the same hypothetical, Ms. Clark testified that the individual would be able to perform such other jobs as: surveillance systems monitor (DOT No. 379.367–010), with about 34,000 jobs nationally and 1,900 jobs locally; bench assembly worker (DOT No. 734.687–018), with 150,000 jobs nationally and 2,100 jobs locally; and buckle wire inserter (DOT No. 734.687–034), with 6,000 jobs nationally and 700 jobs locally. (Tr. 42.) Ms. Clark further testified that the above individual could still perform these jobs if the individual was limited to simple, routine, and repetitive work or used a hand–held assistive device. (*Id.*)

IV. **Evidence Submitted to the Appeals Counsil After the ALJ's Decision**

On January 9, 2012, an MRI of the cervical spine performed showed straightening of the cervical curvature and disc desiccation in the lower cervical spine with left paracentral protrusion abutting the cord at C5–C6 and left paracentral protrusion effacing the thecal sac at C6–C7 without cord compression. (Tr. 264.)

EMG and nerve conduction velocity (NCV) studies also conducted that day, revealed evidence of moderate acute C5 radiculopathy bilaterally. (Tr. 262–63.)

An MRI of the lumbar spine conducted on January 10, 2012, revealed: (1) biforaminal herniations, right greater than left, at L3–L4 resulting in impingement upon the right exiting L3 nerve root and encroachment upon left exiting L3 nerve root; (2) asymmetric left paracentral disc bulging at L4–L5 resulting in impingement upon left L5 nerve root with mild central stenosis and left greater than right neural foraminal narrowing; (3) convexity of mid to lower lumbar spine toward the right and exaggerated lumbar lordosis. (Tr. 265.)

*STANDARD OF REVIEW*

## I.  FRCP 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure ("FRCP") provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  FRCP 12(c).  The legal standards applicable to a FRCP 12(c) motion are the same as those applied to a FRCP 12(b)(6) motion to dismiss.  *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).  To survive a FRCP 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true,  to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  In evaluating a FRCP 12(b)(6) motion, the Court must accept all well–pleaded factual allegations of the complaint as true and draw all reasonable inferences in favor of the non–moving party, here, Plaintiff.  *Id.* at 679. Where a Plaintiff proceeds *pro se*, the Court must construe the pleadings liberally and interpret them to raise the strongest arguments they suggest. *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 472 (2d Cir. 2006).

## II.  Review of Administrative Decisions

In reviewing a final decision of the Commissioner, the Court's duty is to determine whether it is based upon correct legal standards and principles and whether it is supported by substantial evidence in the record, taken as a whole.  *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (the Court "is limited to determining whether the [Social Security Administration's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard").  "'Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (alterations and internal quotation marks omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983). However, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. 42 U.S.C. § 405(g); *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013).

### *DISCUSSION*

## I.     Disability Under the Social Security Act

The Act provides that an individual is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify for Social Security Disability benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D); *accord Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999). The Act's regulations prescribe a five–step analysis for the Commissioner to follow in determining whether a disability benefit claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520(a); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).

First, the Commissioner determines whether the claimant currently is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i).

If not, the Commissioner proceeds to the second inquiry, which is whether the claimant suffers from a medical impairment, or combination of impairments, that is "severe," meaning that the impairment "significantly limits [claimant's] physical or mental ability to do basic work activities." If the impairment is not severe, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii), (c).

If the impairment is severe, the Commissioner proceeds to the third inquiry, which is whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Act's regulations (the "Listings"). If so, the claimant is presumed disabled and entitled to benefits. 20 C.F.R. § 404.1520(a)(4) (iii).

If not, the Commissioner proceeds to the fourth inquiry, which is whether, despite claimant's severe impairment, he has the "residual functional capacity" ("RFC") to perform past work. 20 C.F.R. § 404.1520(a)(4)(iv). In determining a claimant's RFC, the Commissioner considers all medically determinable impairments, even those that are not "severe." 20 C.F.R. § 404.1545(a). If the claimant's RFC is such that s/he can still perform past work, the claimant is not disabled.

If the claimant cannot perform past work, the Commissioner proceeds to the fifth and final inquiry, which is whether, in light of the claimant's RFC, age, education, and work experience, the claimant has the capacity to perform other substantial gainful work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant has such capacity, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

The claimant bears the burden of proving his case at steps one through four; at step five, the burden shifts to the Commissioner to establish that there is substantial gainful work in the national economy that the claimant could perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

## II.    The ALJ's Decision

Plaintiff applied for disability insurance benefits on August 9, 2010, alleging disability as of June 21, 2010, due to spinal disease, left knee injury, and post–traumatic stress. (Tr. 98–103, 117.) The application was denied. (Tr. 45, 48–53, 54–59.) Plaintiff then requested a hearing. (Tr. 60.) He appeared, represented by counsel, before ALJ Patrick Kilgannon on December 13, 2011. (Tr. 26–44.) By decision dated February 23, 2012, ALJ Kilgannon found that Plaintiff was not disabled. (Tr. 9–25.)

After initially determining that Plaintiff has not engaged in substantial gainful activity since the alleged disability onset date, the ALJ found that Plaintiff had the following severe impairments: obesity, left knee disorder, low back disorder, and depression. (Tr. 14.) The ALJ then concluded that these impairments or their combination did not meet or medically equal the severity in one of the impairments in the Listings. (*Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).) Turning to Plaintiff's RFC, the ALJ assessed Plaintiff as having the RFC to perform sedentary work.[5] (Tr. 16.) Specifically, the ALJ found that Plaintiff "can sit for 6 hours and stand for 2 hours with normal breaks during an 8–hour workday," could frequently "push and pull with his lower extremities" and occasionally climb ramps or stairs, balance,

_____

[5] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). Sedentary work also requires that an individual be able to stand and walk for a total of approximately two hours, as well as sit for up to six hours, during an eight–hour workday, with normal breaks. Social Security Ruling 96–9p; *see* 20 C.F.R. § 404.1567(a).

stoop, kneel, crouch, and crawl. (*Id.*) He could not climb ladders, ropes, or scaffolds.

Additionally, Plaintiff was limited to working in a low stress environment (defined as involving

only occasional decision making and occasional changes in the work setting). (*Id.*) Since the

ALJ found that Plaintiff was unable to perform his past relevant heavy work as a plumber, the

ALJ proceeded to step five of the sequential evaluation process. (Tr. 19.) The ALJ considered

Plaintiff's RFC, and vocational factors of age, education, and past work experience, and

concluded that Plaintiff could perform work that exists in significant numbers in the national and

local economies, and, thus, found Plaintiff not disabled. (Tr. 19–21.)

The ALJ's decision became the final decision of the Commissioner when the Appeals

Council denied Plaintiff's request for review on April 24, 2013. (Tr. 1–5.) This action followed.

### III.     The ALJ Failed to Comply with the Treating Physician Rule

"Regardless of its source," Social Security regulations require that "every medical

opinion" in the administrative record be evaluated when determining whether a claimant is

disabled under the Act. 20 C.F.R. §§ 404.1527(d), 416.927(d). "Acceptable medical sources"

that can provide evidence to establish an impairment include, *inter alia*, Plaintiff's licensed

treating physicians and licensed or certified treating psychologists. *See* 20 C.F.R. §§

404.1513(a), 416.913(a).

Social Security regulations require that the ALJ give "controlling weight" to the medical

opinion of an applicant's treating physician so long as the opinion is (1) "well–supported by

medically acceptable clinical and laboratory diagnostic techniques" and  (2) is not inconsistent

with the other substantial evidence in [the] case record." *Lucas v. Barnhart*, 160 Fed App'x 69,

71 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Rosa v. Callahan*, 168 F.3d 72,

78–79 (2d Cir. 1999). Medically acceptable clinical and laboratory diagnostic techniques

include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool." *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.2003) (citation omitted).

It bears emphasis that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Correale–Englehart v. Astrue*, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010). The preference for a treating physician's opinion is generally justified because "[such] sources are likely to be [from] the medical professionals most able to provide a detailed, longitudinal picture of [the Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). By the same token, the opinion of a consultative physician, "who only examined a Plaintiff once, should not be accorded the same weight as the opinion of [a] Plaintiff's treating [physician]." *Anderson v. Astrue*, 07 CV 4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (citing *Spielberg v. Barnhart*, 367 F.Supp.2d 276, 282–83 (E.D.N.Y.2005)). This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Id.* (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir.1990)). In addition, opinions of consulting physicians—whether examining or non–examining—are entitled to relatively little weight where there is strong evidence of disability on the record, or in cases in which the consultant did not have a complete record. *Correale–Englehart*, 687 F. Supp. 2d at 427.

Pursuant to the ALJ's duty to develop the administrative record, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79 (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven

if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*.")). Thus, "if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." *Correale–Englehart*, 687 F. Supp. 2d at 428.

If the ALJ did not afford "controlling weight" to opinions from treating physicians, he needed to consider the following factors: (1) "the frequency of examination and the length, nature and extent of the treatment relationship;" (2) "the evidence in support of the opinion:" and (3) "the opinion's consistency with the record as a whole;" and (4) whether the opinion is from a specialist." *Clark*, 143 F.3d at 188; *accord Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). Furthermore, when a treating physician's opinions are repudiated, the ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (*per curiam*); *see Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(d)(2) (stating that the Social Security agency "will *always* give good reasons in [its] notice of determination or decision for the weight [given to a] treating source's opinion") (emphasis added). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." *See Burgin v. Astrue*, 348 F. App'x 646, 648 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33 (stating that the Second Circuit will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and . . . will continue remanding when [the Second Circuit] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." (changes in original omitted))).

The ALJ incorrectly applied these principles in this case. As described below, the Plaintiff's treating physicians provided treatment history supported with medical documentation that diagnosed Plaintiff with mental impairments, as well as physical limitations in his left knee and lumbar spine. The ALJ rejected or failed to consider key findings of Plaintiff's treating sources, and instead relied largely on the opinions of the agency consulting physicians, as well as an agency psychiatry reviewer. In so doing, the ALJ failed to comply with Social Security regulations that require him to address the evidence supporting the treating doctors' opinions, provide good reasons for why he was rejecting or giving lesser weight to Plaintiff's treating sources' opinions, and adequately develop the record.

## A. Plaintiff's Mental Impairments

Regarding Plaintiff's mental impairments, the administrative record reflects that Plaintiff treated by two psychiatrists: (1) Dr. Kharitonova, who treated Plaintiff from December 16, 2009 to August 30, 2010 (Tr. 171–85), and (2) Dr. Shpitalnik, who treated Plaintiff from September 7, 2010 to November 22, 2011 (Tr. 237–241). The ALJ departed from the treating physician rule by failing to explain whether he gave any weight to Dr. Kharitonova's opinion and according only "some weight" to the opinion of Dr. Shpitalnik. Instead, the ALJ assigned "significant weight" to the opinion of Dr. Jackson, an agency consulting physician who examined Plaintiff once on October 7, 2010 (Tr. 194–97), and Skranovski, a state agency psychiatry reviewer who completed a "Psychiatric Review Technique" based on Plaintiff's files on October 27, 2010 (Tr. 198–211).

At Plaintiff's initial evaluation on December 16, 2009, Dr. Kharitonova diagnosed Plaintiff with adjustment disorder with mixed anxiety, alcohol dependency, depressed mood, and panic disorder without agoraphobia. She prescribed an antidepressant Lexapro, and

recommended psychotherapy.  (Tr. 173, 177.)  Plaintiff thereafter visited Dr. Kharitonova at least once a month until a few months after his alleged disability onset date.  (Tr. 174–76, 180–83, 185.)  Dr. Kharitonova's observations during these visits consistently reflected anxious mood, constricted affect, and reduced attention and concentration.  On June 9, 2010, Dr. Kharitonova began prescribing Buspar, an anti–anxiety medication, in addition to Lexapro.  (Tr. 181.)

The ALJ improperly departed from the treating physician rule with respect to Dr. Kharitonova's opinions.  First, the ALJ did not state expressly state what weight, if any, he ascribed to Dr. Kharitonova's findings.  (*See* Tr. 18.)  This plainly fails to satisfy requirements governing opinions of treating sources.  Second, the ALJ appeared to implicitly reject portions of Dr. Kharitonova's opinions without setting forth any reasons for doing so.  *See Snell*, 177 F.3d at 133 ("Failure to provide explicit 'good reasons' for not crediting a treating source's opinion is a ground for remand.")  The ALJ's opinion relies on portions of Dr. Kharitinova's findings that are consistent with the ALJ's conclusions (*see* Tr. 17 (citing to Kharitonova's reports observing that Plaintiff did not have delusions, hallucinations, suicidal or homicidal ideations, that his judgment and insight were consistently rated as fair, and that his thought process was coherent), while failing to acknowledge other findings that are inconsistent.  Of potential significance for assessing Plaintiff's impairments are Dr. Kharitinova's findings that Plaintiff exhibited reduced attention and concentration, and recommendations that Plaintiff continue taking prescribed antianxiety and antidepressant medication.  The ALJ's selective reliance on the medical findings of a treating source, without providing good reasons for discrediting that source's other findings, is clearly erroneous.

The ALJ also failed to satisfy Social Security regulations with regard to Dr. Shpitalnik's findings. The only explanation the ALJ gave for assigning "some," but not controlling, weight to

Dr. Shpitalnik's opinions is that he did not "offer[] an opinion regarding [Plaintiff's] ability to perform work related activities." (Tr. 18.) The ALJ, however, misstates the record, which included a "Progress Note" dated November 22, 2011 stating that "at the present time the patient is unable to function in any work setting." (Tr. 241.) In a February 1, 2011 evaluation, Dr. Shpitalnik also remarked that "[p]ersistent depression and anxiety affect [Plaintiff's ability to concentrate which interferes with his daily activities." (Tr. 237.) He further indicated that due to physical pain, Plaintiff "is withdrawn, homebound; he quit almost all of his usual activities." (*Id.*) While the ultimate determination as to disability rests within the discretion of the Commissioner, that decision must take into account the findings of a treating source in determining the nature and severity of the claimant's impairment and must explain what weight was given to those findings, or if they were rejected, why. *Correale–Englehart*, 687 F. Supp. 2d at 430. Here, the ALJ's erroneous description of Dr. Shpitalnik's conclusion and consequent failure to consider or give controlling weight to his opinion, or provide good reasons for not doing so, constituted plain error.

Additionally, if an ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request the missing information from the physician. *Id.* at 428. Thus, to the extent the ALJ believed that Dr. Shpitalnik's opinion was deficient for not opining on Plaintiff's ability to perform work–related activities, he was required to "seek additional evidence or clarification" from the medical source. *Calzada v. Asture*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (citing 20 C.F.R. 404.1512(e)(1)). The need to seek supplementation is particularly important here, where it appears that there are missing pages at least from Dr. Shpitalnik's September 7, 2010 report. (*See* Tr. 240.) Rather than rejecting Dr.

Shpitalnik's opinion, the ALJ should have assessed the basis for the diagnosis by developing the record. *See Rosa*, 168 F.3d at 179 (concluding that it was error for the ALJ to attach significance to omissions by the treating physician rather than seek more information).

The Court notes that Dr. Shpitalnik's opinion had a medical basis. *Green–Younger*, 335 F.3d at 107 ("Medically acceptable clinical and laboratory diagnostic techniques" includes "physical examinations and diagnostic procedures" and the consideration of Plaintiff's "complaints, or [medical] history."). Prior to rendering his opinions, Dr. Shpitalnik considered Plaintiff's complaints and conducted mental status examinations. With respect to cognitive functions, for example, Dr. Shpitalnik tested Plaintiff's short–term memory through recall of objects after a brief interval, and measured his attention and concentration through serial subtraction and in general conversation. (Tr. 240.) Dr. Shpitalnik found that Plaintiff could only recall one of three objects after a five minute interval, and that his attention and concentration is limited. (*Id.*)

Furthermore, the remaining medical evidence in the record was not substantially inconsistent with Dr. Shpitalnik's findings. To the contrary, the ALJ failed to acknowledge or consider substantial evidence supporting Dr. Shpitalnik's opinion which, if properly considered, would have supported application of the treating physician rule and a finding that Plaintiff is disabled. The ALJ failed to discuss the substantial consistencies between the findings of Plaintiff's treating psychiatrists, both of whom repeatedly observed anxious mood and attention concentration deficit, as well as prescribed Lexapro and Buspar. (*See, e.g.*, Tr. 177, 238, 241.) Dr. Shpitalnik's findings are also largely consistent with those of Dr. Jackson, an agency consulting psychologist to whom the ALJ gave "significant weight" "because she conducted a physical examination of the [Plaintiff] in person." (*See* Tr. 18.) The ALJ's opinion, however,

omits that Dr. Jackson in fact issued a diagnosis of depressive disorder and anxiety disorder. (Tr. 196–97.) Dr. Jackson further agreed that Plaintiff should continue with the course of antidepressant and anti–anxiety medications prescribed by his treating physicians. (Tr. 197.) Skranovski, the agency's psychiatry consultant who also was given significant weight by the ALJ (*see* Tr. 18), further confirmed a medically determinable impairment in the categories of affective disorders (Tr. 201), anxiety–related disorders (Tr. 203), and substance addiction disorders (Tr. 206).

Dr. Jackson's examination also does not discredit Dr. Shpitalnik's findings of diminished short–term memory. Indeed, the ALJ failed to address that Dr. Jackson's examination similarly indicated limitations in Plaintiff's recent memory functions, with the ability to recall only one out of four objects in five minutes. (Tr. 196). Despite assigning significant weight to Dr. Jackson's findings, the ALJ further fails to acknowledge or consider Dr. Jackson's opinion that Plaintiff's statements that he socializes minimally, and does not cook, clean or shop for himself, take public transportation, or drive "do appear to be consistent" with his "current mental status[.]" (*Id.*) In short, the ALJ ignores findings that corroborate Dr. Shpitalnik's opinion, instead selectively relying on Dr. Jackson's report insofar as it supported the ALJ's conclusion. The failure to consider this relevant evidence was plain error. *See Kane v. Astrue*, 942 F. Supp. 2d 301, 312 (E.D.N.Y 2013).

Moreover, even if Dr. Shpitalnik's opinion conflicts with other medical evidence that might be considered substantial, the ALJ must still consider various factors to determine how much weight, if any, to give to that treating doctor's opinion. *See Burgess*, 537 F.3d at 129 (the ALJ must consider, *inter alia*, the frequency, length, nature, and extent of the treatment relationship).

The ALJ implicitly accorded less weight to the treating source opinions because he relied on Dr. Jackson's and Skranovski's reports to the extent that they were inconsistent with the findings of Plaintiff's treating psychiatrists. The ALJ's perfunctory explanation for his reliance on the consulting physicians' opinions, and his rejection of the treating physicians' evaluations, cannot withstand judicial scrutiny. *See Smollins v. Astrue*, 11 CV 424, 2011 WL 3857123, at *10 (E.D.N.Y. Sept. 1, 2011). The ALJ should have considered that Dr. Jackson only examined Plaintiff once, and Skranovski rendered an opinion on October 26, 2010 based only on a limited file review. (Tr. 198; *see* Tr. 212–13.) In contrast, Dr. Shpitalnik saw Plaintiff at least three times over the course of a year, and Dr. Khariparov saw Plaintiff at least once a month over a six–month period before the alleged disability onset date and for a few months following. Therefore, the treating doctors' conclusions were based on observations more linked to Plaintiff's daily activities than were those of Dr. Jackson and Skranovski, whose one–time assessments should not have been considered substantial evidence. *See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 282–83 (E.D.N.Y. 2005).

Furthermore, it is unclear whether the ALJ sufficiently scrutinized Skranovski's qualifications or report. While the record indicates that Dr. Skranovski is qualified in psychiatry, Plaintiff correctly observes that the ALJ did not note Skranovksi's profession and may not have appropriately considered Skranovski's qualifications in assigning more weight to his opinion than those of the treating sources. (See Tr. 18.) It also appears that Dr. Skranovski conducted only a limited review of the file; for instance, it appears that he reviewed Dr. Kharitonova's, but not Dr. Shpitalnik's, reports. (*See* Tr. 212.) Skranovski nonetheless concluded that Dr. Kharitonova's documentation lacked credibility because "the treatment notes [were] simple repeats of the same" and "the provider fail[ed] to perform comprehensive/standard/formal testing

of concentration/memory." (Tr. 210.) Given the significant and largely consistent medical evidence on the record from treating sources who examined Plaintiff on multiple occasions, as well as the substantially consistent medical evidence from a non–treating source who examined Plaintiff, the ALJ's decision to accord significant weight to Dr. Skranovski's bare–bones opinion was erroneous.

### B. Plaintiff's Physical Impairments

The ALJ also failed to properly apply the treating physician rule with respect to Plaintiff's physical impairments. In his opinion, the ALJ concluded that the diagnoses, conclusions, and treatment decisions of Plaintiff's two treating neurologists, Drs. Stiler and Nagendra, were not entitled to controlling weight. The ALJ found that the opinion of Dr. Stiler was entitled to "little weight" because it was inconsistent with the record. The ALJ also chose not to accept Dr. Stiler's conclusion that Plaintiff "has a temporary total disability" because that determination is reserved for the Commissioner. (Tr. 18.) With regard to Dr. Nagendra, the ALJ afforded only "some weight" to his opinions because he did not offer an opinion regarding Plaintiff's work activities. (*Id.*)

Additionally, the ALJ erred by neglecting to set forth the weight he gave to the opinions of Dr. Tehrany, an orthopedic surgeon who evaluated Plaintiff on July 27, 2010 and February 3, 2011, and Dr. Fricano, a board certified chiropractic neurologist who examined and treated Plaintiff on June 29, 2010. (*See* Tr. 164–65, 159–62, 251.)

The Court finds that the ALJ did not fulfill his duty to develop the administrative record in connection with Plaintiff's physical impairments. It appears, for instance, that documents from Plaintiff's treatment with Dr. Stiler are missing from the record. (*See* Tr. 255 (report from a September 9, 2011 examination indicating that it was a "follow[–]up" on a prior examination;

however, the record does not reflect any reports from Dr. Stiler for examinations before or after the September 9 visit).)  Because Dr. Stiler is a treating source, details regarding Plaintiff's treatment history with Dr. Stiler, are critical to assessing Plaintiff's physical impairments.  The ALJ also failed to inquire about records from two physicians referenced in Dr. Stiler's report— Dr. Chapman, who Plaintiff was seeing for pain management, and Dr. Frasier, a surgeon who evaluated Plaintiff.  (Tr. 255).  Moreover, the ALJ improperly discounted findings from Dr. Nagendra without first attempting to seek additional information to fill in any gaps in Dr. Nagendra's reports.  As previously discussed, an ALJ may not discredit a treating source's reports on the basis that the report did not offer an opinion regarding Plaintiff's ability to engage in work activities.  The ALJ instead was obligated to seek clarification from the treating source.  *See Rosa*, 168 F.3d at 69.

Moreover, the ALJ's conclusion that Dr. Stiler's findings are inconsistent with the record is unsupported by substantial evidence.  During an examination on September 9, 2011, Dr. Stiler noted an increase in pain in Plaintiff's left knee, and that Plaintiff rated the pain in his knee and lower back as 8–9, on a scale rating 10 as the worst possible pain.  (Tr. 255.)  Dr. Stiler found L3 through S1 tenderness with spasm, and range of motion below the normal degree in Plaintiff's lumbar spine.  (*Id.*)  Dr. Stiler further noted "tenderness in the infrapatellar region on the left increasing with external rotation and flexion of left knee" along with "antalgic gait."  (Tr. 256.) Dr. Stiler concluded that Plaintiff required authorization for surgery of the left knee, followed by rehabilitation, which might resolve problems in Plaintiff's lower back.   Dr. Stiler further concluded that due to the alteration in Plaintiff's gait, his "lumbar symptoms will continue and get worse" if the pathology in his left knee is not resolved."  (*Id.*)

In assigning little weight to Dr. Stiler's opinions, the ALJ failed to acknowledge or consider the significant consistencies between Dr. Stiler's findings and those of other treating sources—Drs. Nagendra, Tehrany, and Fricano. During a June 10, 2010 examination, Dr. Fricano similarly observed decreased lumbosacral range of motion, as well as compression and edema in Plaintiff's left knee. (Tr. 164.) Dr. Fricano issued a diagnosis for cervical, thoracic, and lumbar disc syndrome, and internal derangement of the left knee, and recommended a course of physical therapy and chiropractic treatment. (Tr. 164–65.) On July 27, 2010, Dr. Tehrany evaluated Plaintiff and found tenderness in the left knee. Although Dr. Tehrany found that Plaintiff exhibited a full range of motion in his knee, she also noted that Plaintiff reported pain, multiple bouts of swelling, and episodes of knee−locking. She diagnosed internal derangement of the left knee with possible loose fragment. (Tr. 159.) Thereafter, in February 2011, Dr. Tehrany requested medical clearance for Plaintiff to undergo surgery to remove a loose body in his knee. (Tr. 251.) Plaintiff was also treated by Dr. Nagendra once to twice per month from at least August 2010 to January 2011. (Tr. 227–36.) Dr. Nagendra consistently indicated abnormal ranges of motion and pain in Plaintiff's thoracic and lumbar spine, as well as his left knee. (*See, e.g.*, Tr. 234, 236.) Throughout his treatment of Plaintiff, Dr. Nagendra prescribed Percocet for pain and recommended physical therapy. (Tr. 228, 233–36.)[6]

Nor are Dr. Stiler's findings are contradicted by Dr. Misra's September 30, 2010 consulting examination. (Tr. 186). On physical examination, Dr. Misra observed that Plaintiff walked with a prescribed cane, was not able to do heel walking, toe walking, or squatting. (Tr.

---

[6] Dr. Stiler's opinions also are consistent with an October 11, 2010 progress report completed by Dr. Funicelli for the Worker's Compensation Board. (Tr. 166–67.) Based on his examination of Plaintiff, Dr. Funicelli diagnosed lumbosacral radicular syndrome and internal derangement of the knee, and opined that Plaintiff had a 100% temporary impairment and could not return to work. (*Id.*)

188.)  Dr. Misra also found "very restricted" movements in the thoracic/lumbar spine.  (Tr. 188, 192.)  Dr. Misra observed restriction of movement of the hip and knee joints.  (Tr. 188, 192.)  As reflected in range of motion charts from the examination, Plaintiff exhibited a 0–5 degree flexion–extension in the left knee, well below the normal range of 0–120; a 0–10 flexion–extension of the lumbar spine, compared to the normal range of 0–90; and lateral flexion of 5 degrees on both sides of the lumbar spine, compared to a normal range of 0–30.  (Tr. 191–92.)  Dr. Misra stated a likely diagnosis of disease of diskogenic type in the cervical spine, thoracic and lumbar spine, and opined that Plaintiff "will not be able to do jobs[] which require prolonged standing, sitting, walking, bending, climbing, lifting, pulling, or pushing."  (Tr. 189.)[7]  Notwithstanding the consistencies with Dr. Stiler's findings, the ALJ discounted Dr. Misra's findings as entitled to little weight because Dr. Misra did not have access to radiological or neurological information.  (Tr. 18.)

Against the weight of this evidence, the ALJ relied primarily on the opinion of Dr. Govindraj, a consulting physician who examined Plaintiff on January 19, 2012.  The ALJ explained that Dr. Govindraj was entitled to significant weight because he had access to Plaintiff's records and physically examined Plaintiff.  (Tr. 18, 257).  Contrary to other physician findings on the record, Dr. Govindraj found no tenderness and normal range of motion in the spine, normal range of motion in the back, normal gait, and no need for a cane for ambulation.  (Tr. 259.)  Dr. Govindraj concluded that Plaintiff "was medically stable and cleared with no restriction standing, walking, or lifting weights."  (Tr. 259.)  Although Dr. Govindraj noted that Plaintiff was taking several Percocet tablets a day in addition to his other medications, Dr.

---

[7] Dr. Misra also noted that Plaintiff was driven to the exam by his father, that he could not drive, could stand for only 15 minutes, and sit for a half hour, and was not capable of lifting or carrying any weight at the time.  (Tr. 187.)

Govindraj expressed no opinion regarding the continued use of pain medications in light of his findings that Plaintiff had virtually no limitations. (Tr. 258). The ALJ nowhere addresses this issue, nor the inconsistencies between Dr. Govindraj's findings and that of other physicians. Nor does he explain why he credits Dr. Govindraj's findings over those of Drs. Stiler, Nagendra, Fricano, and Misra.[8] To the extent the ALJ suggests that Dr. Govindraj had access to more records than Dr. Misra, such a finding is unsupported by the record. The ALJ also fails to acknowledge or consider that Dr. Govindraj only examined Plaintiff once, compared to Plaintiff's follow–up visits with Dr. Stiler and numerous visits with Dr. Nagendra.[9]

## IV.    Remedy

Accordingly, the Court remands this action, instructing the ALJ to develop the record, determine whether the opinions of Plaintiff's treating physicians deserve controlling weight, and if applicable, articulate reasons for according less than controlling weight to these opinions.

Although Plaintiff's cross–appeal addresses only the core issue of the ALJ's misapplication of the treating physician rule, the Court additionally observes that the failure to correctly apply that rule may be intertwined with other errors in the ALJ's determination that Plaintiff is not disabled under the Social Security Act. For instance, in considering the evidence, the ALJ failed to meaningfully consider the *combined* effect of Plaintiff's mental impairments,

---

[8] Given Dr. Stiler's findings regarding Plaintiff's pain in his left knee, Dr. Govindraj's determination that Plaintiff exhibited normal ranges of motion, after he began taking Percocet, was not necessarily inconsistent with Dr. Stiler's findings of disability. *See Zubizarreta v. Astrue*, 08 CV 2723, 2010 WL 2539684, at *6 (E.D.N.Y. June 16, 2010).

[9] Several treating physicians are referenced in Dr. Govindraj's report, including Dr. Chapman, who is also referenced in Dr. Stiler's report. Additionally, Dr. Govindraj mentions Dr. Junicelli, a chiropractor; Dr. Shary, a neurologist; and Dr. Mani, Plaintiff's primary care physician. (Tr. 257–58.) The administrative record, however, does not contain the reports of any of these other doctors. The absence of these reports further suggests that Plaintiff's medical record was not adequately developed during the administrative review process.

*i.e.*, anxiety, short–term memory impairments, and concentration deficits, as found by his treating and examining physicians. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c) (requiring a determination of whether the claimant suffers from a medical impairment, or *combination of impairments*, that is "severe"). Thus, on remand, the ALJ should also consider the effects of Plaintiff's combined mental impairments in every step of the five–step sequential analysis.

After developing the record and according the appropriate weight to the various medical sources on the record, the ALJ should additionally reassess Plaintiff's credibility with reference to the factors listed in 20 C.F.R. § 404.1529(c)(3)(i)–(vii). To the extent the ALJ discredits Plaintiff's statements concerning his pain or the intensity, persistence and limiting effects of his impairments, the ALJ should indicate how he assessed and balanced the various factors.[10]

Lastly, the ALJ should adequately develop the record with respect to, and explain the bases for, his RFC assessment. Among the information that the ALJ is required to obtain from a treating source at stage five of the analysis is "a statement of what [the claimant] can still do despite [her] impairment(s) based on her acceptable medical sources' findings on her factors under paragraphs (b)(1) through (b)(5) of this section." 20 C.F.R. § 404.1513(b)(6). The ALJ must also adequately explain the reasoning underlying an RFC determination and the basis on which it rests. *See, e.g.*, *Correale–Englehart*, 687 F. Supp. 2d at 440 (citing cases).[11]

---

[10] In his written decision, the ALJ noted that "contrary to . . . [Plaintiff's] alleged physical condition," the ALJ "observed that [Plaintiff] was able to sit throughout the entire [video] hearing without having to take a break or move into different positions." (Tr. 18.) However, the Second Circuit has rejected the propriety of subjecting claimants to a "sit and squirm index." *Aubeuf v. Schweiker*, 649 F.2d 107, 113 (2d Cir. 1981).

[11] The Court observes that absence of medical evidence regarding whether Plaintiff can sit for six hours and stand for two hours in an eight–hour work day, perform frequent pushing or pulling with his lower extremities, or maintain concentration to perform sedentary work renders the ALJ's RFC current analysis unsupported by the evidence. Indeed, evidence on the record appears to support an alternate conclusion that Plaintiff cannot perform sedentary work.

## *CONCLUSION*

For the reasons set forth above, the Court DENIES the Commissioner's motion for judgment on the pleadings and GRANTS Bracco's cross-motion. The Commissioner's decision is remanded for further consideration and new findings consistent with this Memorandum & Order. The Clerk of Court is respectfully requested to enter judgment accordingly.

SO ORDERED:

 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: March 31, 2015
        Brooklyn, New York

---

Additionally, the ALJ's finding that Plaintiff has sufficient concentration, based on a purported ability to drive, is inconsistent with much of the evidence on the record.